John F. Palladino, Esq. (JP8794)
Hankin Sandman & Palladino
30 S. New York Avenue
Atlantic City, NJ 08401
Phone: (609) 344-5161
Fax: (609) 344-7913
***Attorneys for Plaintiffs, Asphalt Paving Systems, Inc. and Dosch-King Co., Inc.***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPHALT PAVING SYSTEMS, INC.; and DOSCH-KING CO., INC.,<br>Plaintiff<br>v.<br>ASPHALT MAINTENANCE SOLUTIONS, LLC; NORTH WHITEHALL TOWNSHIP; PLUMSTEAD TOWNSHIP; SOLEBURY TOWNSHIP; UPPER MACUNGIE TOWNSHIP; BOROUGH OF MACUNGIE, LOWER MACUNGIE TOWNSHIP; and OLEY TOWNSHIP,<br>Defendants | Civil Action No.: 12-2370 |

PLAINTIFFS' BRIEF IN OPPOSITION
TO DEFENDANT ASPHALT MAINTENANCE SOLUTIONS, LLC'S
MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS


| | Page # |
|---|---|
| Table of Citations | ii |
| Introduction. | 1 |
| The Salient Facts | 2 |
| Legal Argument | 4 |
| I. The Governing Standard on Review of Motion to Dismiss | 4 |
| II. Summary of Argument | 4 |
| (a) Exclusive Dealing | 5 |
| (b) The Ultra Vires Specifications. | 5 |
| III. The Relevant Market has been Plead with Sufficient Particularity | 6 |
| (a) Governing Principles. | 6 |
| (b) Plaintiffs Have not Only Defined the Relevant Markets But also Demonstrated Actual Anticompetitive Effects | 8 |
| IV. The Noerr-Pennington Doctrine Does Not Apply to Bar Plaintiffs Antitrust, §1983, Tortious Interference Civil Conspiracy or State Law Claims | 12 |
| V. APS Has Standing to Challenge the Unlawful Bid Specifications | 14 |
| Conclusion | 18 |

Table of Citations

**CASES:**

Albright v. City of Shamokin, 277 Pa. Super. 300 (Sup. Ct. Pa 1980). . . . . . . . . 13

Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital, . . . . . 14
185 F. 3d 154 (3d. Cir. 1999)

C.O. Falter Construction Corporation v. Towanda Municipal Authority,. . . . . . . . 16
149 Pa. Comwlth 74 (1992)

California Dental Ass'n v. F.T.C., 526 U.S. 756, 119 S.Ct. 1064,.. . . . . . . . . . . . 8
143 L.Ed.2d 935 (1999)

City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 111 S.Ct.. . . 12
1344, 113 L.Ed.2d 382 (1991)

Continental T.V., Inc. v. GTE Sylvania, 433 U.S. 36, 97 S.Ct. 2549,. . . . . . . . . . 7
53 L.Ed.2d 568 (1977)

Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,.. . . . . . . . . . . 14
365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961)

Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451,. . . . . . . . 6, 8
112 S.Ct. 2072, 119 L.Ed.2d 265 (1992) 10, 11

F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 106 S. Ct. 2009,. . . . . . . . . . 7, 8
90 L.Ed.2d 445 (1986) 11

Finn v. Rendell, 990 A.2d 100 (Pa. Cmwlth. 2010).. . . . . . . . . . . . . . . . . . . . . . . 15, 17

Hishon v. King Spaulding, 467 U.S. 69, 104 S.Ct. 2229,. . . . . . . . . . . . . . . . . . . 4
81 L.Ed.2d 59 (1984)

Illinois Tool Works, Inc. v. Independent Ink, Inc., 547 U.S. 28, 126 S.Ct.. . . . . . 7
1281, 164 L.Ed.2d 26 (2006)

Jefferson Parish Hosp Dist No. 2 v. Hyde, 466 U.S. 2, 104 S.Ct 1551,. . . . . . . . 7
80 L.Ed.2d 26 (2006)

Mechanical Contractors Association of Eastern Pennsylvania, Inc. v.. . . . . . . . . 15, 16
Southeastern Pennsylvania Transportation Authority, 654 A.2d 119
(Pa. Cmwlth. 1995)

Metz v. Housing Authority of the City of Pittsburgh [No. GD. 88-01957 (Allegheny C.C.P.), aff'd 121 P.A. Comwlth. 210 (1988), allocatur den. 525 Pa. 607 (1990)] . . . . . . . . 15

Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984) . . . . . . . . 8

Phillips Brothers Electrical Contractors, Inc. v. Valley Forge Sewer Authority, 999 A.2d 652 (Pa Comm. Ct. 2010) . . . . . . . . . . . 14, 16, 17

Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 (3d Cir. 2002). . . . . . . . . . . . 4

Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3rd Cir. 1997). . . . 6, 9, 10, 11

Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . 8

Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir. 1991). . . 7

UIBO Corp., Inc. v. Conway, 669 F.3d 675, 684 (6th Cir. 2012). . . . . . . . . . . . . . 14

U.S. v. Fisbach & Moore, Inc., 750 F.2d. 1183 (3rd. Cir. 1984). . . . . . . . . . . . . . . 7

U.S. v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L.Ed. 1129 (1942) . . . . . . . 7

Wilson v. Southeastern Pennsylvania Transp. Authority, 704 F. Supp. 623 (E.D. Pa. 1989) . . . . . . . . 13

Xcalibur Intern. Ltd., LLC v. Gen. State of Louisiana, 612 F.3d 368, (5th Cir. 2010) . . . . . . . . . . 14

**CODES:**

67 PA Code §449.3(f). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 16, 17

**MISCELLANEOUS:**

The "Rule of Reason" in Antitrust Analysis: General Issues, 37-38 (Federal Judicial Center, June 1981) . . . 8

**RULES:**

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## ***INTRODUCTION***

This is not as Asphalt Maintenance Solutions, LLC's ("AMS") Introduction suggests a "dispute aris[ing] out of competition." Rather, it is a lawsuit aimed at creating competition. In hoping to avoid that threat, AMS has brought the present motion, seeking not so much a ratification of its anti-competitive conduct, as a judicial acknowledgment that this Court is powerless to stop it.

For the reasons which follow, the Motion must be denied.

## ***THE SALIENT FACTS***

At the core of Plaintiffs' Complaint is AMS's effort to deprive taxpayers in Lehigh, Berks and Bucks counties the benefits of open competition for public road work and the concurrent detriment suffered by Plaintiffs and others similarly situated who are being wrongfully denied the right to compete for that work.

The details of AMS's monopolistic strategy and actions are plead ***ad nauseam*** in the First Amended Complaint (the "FAC"), for purposes of this Motion we will distill them to the following:

1. AMS is the exclusive distributor of Grip Tight in the North East United States and is also a road maintenance contractor.

2. AMS has conspired with the Municipal Defendants to issue ***ultra vires*** brand name/sole source specifications which mandate the use of "Grip Tight"[1] and "High Performance Chip Seal" ("HPCS")[2].

3. Perhaps most significantly, AMS has refused to make Grip Tight available to road maintenance contractors such as Plaintiffs. Accordingly, when the Defendant Municipalities specified the use of Grip Tight, they not only guaranteed AMS a supply contract, but, perhaps unwittingly, guaranteed AMS would be the only contractor that could perform the work; and

---

[1]Grip Tight is a brand name of Fog Seal, a road surfacing product.

[2]HPCS is a generic term for a type of road maintenance product known as Bituminous Seal Coat ("BSC"). BSC is defined by the Pennsylvania Department of Transportation in Bulletin 408 Section 470 as the "application of bituminous material immediately followed by the application of coarse aggregate."

4. AMS secured all of the HPCS practicably available for work in Lehigh, Berks and Bucks Counties (the "Monopoly Area") ***before*** the 2012 specifications were made public; either evidence of AMS's unlawful knowledge of coming specifications or an inexplicable leap of faith.

To its credit, AMS does not attempt to legitimize its conduct; rather, it argues that is beyond the scope of Anti-Trust law or otherwise protected by pleading niceties. Our analysis of this distasteful argument ensues.

## *LEGAL ARGUMENT*

### I. *The Governing Standard on Review of Motion to Dismiss*

Under the well-settled standard for dismissal under Fed.R.Civ.P. 12(b)(6) , a court passing on such a motion must accept all of the allegations in the complaint as true and must give the Plaintiffs the benefit of all reasonable inferences that can be drawn from those allegations. Pinker v. Roche Holdings Ltd., 292 F.3d 361, 374 (3d Cir. 2002). So long as the as any set of facts consistent with the allegations of the complaint can be proven that would entitle the plaintiff to relief, the motion ***must*** be denied. Id., see also Hishon v. King Spaulding, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984).

### II. *Summary of Argument*

Plaintiffs' FAC asserts that AMS has engaged in two distinct violations of relevant antitrust law, a fact lost or ignored by AMS in their motion.[3] See FAC, at ¶201. Specifically, Plaintiffs allege that:

1) AMS has illegally restrained trade by entering into exclusive dealing arrangements for the distribution and sale of both Grip Tight and HPCS; and

2) AMS has illegally restrained trade by conspiring with the Defendant Municipalities to issue ***ultra vires*** bid specifications that improperly mandate the use of Grip Tight and HPCS.

These two discrete claims are independently actionable and must be analyzed as such.

---

[3] In the AMS brief, the distinction between the two legal theories is largely ignored in hopes of sweeping them both within its Noerr preclusion claim.

(a) Exclusive Dealing

The FAC alleges that AMS has improperly restrained trade by entering into exclusive dealing arrangements for Grip Tight and HPCS. AMS attempts to link this claim to the actions of the Defendant Municipalities, and thus excuse it by application of the Noerr-Pennington Doctrine, that linkage is improper. The exclusive dealing claims against AMS are independent of the improper bid specifications. In other words, *even if* no conspiracy existed and the bid specifications were legal, AMS still engaged in illegal anticompetitive behavior by depriving all other road maintenance contractors access to the supplies using its exclusive dealing arrangements to garner an "exclusive" on the entire municipal roadway maintenance market in the Monopoly Area for all projects requiring Grip Tight and HPCS.

(b) The ***Ultra Vires*** Specifications

The second claimed antitrust violation raised in the FAC is AMS's attempt to monopolize the municipal roadway maintenance market through a conspiracy with the Defendant Municipalities, which resulted in the issuance of ***ultra vires*** bid specifications resulting in AMS becoming the sole viable bidder for roadway maintenance in the Monopoly Area. This claim is not reliant on AMS's exclusive dealing arrangements for Grip Tight and HPCS, but arises from the actual manipulation of the bidding process with the intent to monopolize. In this instance, the manner in which the bid specifications were manipulated capitalized on the exclusive dealing arrangements by mandating the use of those products, but would be actionable without the exclusive dealing arrangements if a conspiracy existed to manipulate the bid specifications in some other illegal manner with the intent of steering all work to AMS. It so happens that the means (brand name/sole

source specifications) used by AMS to get to its end is explicitly "unlawful" under the Pennsylvania Code. AMS's arguments relating to the Noerr-Pennington doctrine only applies to this second violation of antitrust law, and, in any event, still fail because the specifications are ***ultra vires***.

### III. *The Relevant Market has been Plead with Sufficient Particularity*

AMS argues that Plaintiffs' claims for violation of the Sherman and Clayton Acts arising from its exclusive dealing arrangements involving Grip Tight and HPCS must be dismissed because Plaintiffs failed to identify the relevant markets for those products and because they are interchangeable with other products. As demonstrated below, AMS's position is both factually and legally inaccurate

(a) Governing Principles

In an antitrust case, a plaintiff must identify the relevant product and geographic markets over which the defendant exercises market power. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430 (3rd Cir. 1997). However, "in most cases, proper market definition can be determined only after a factual inquiry into the commercial realities faced by consumers," thus the analysis should not be made prior to the close of discovery. Id., at 436; citing Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 482, 112 S.Ct. 2072, 2090, 119 L.Ed.2d 265 (1992).

The "boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." Queen City, 124 F.3d at 436.

> Interchangeability implies that one product is roughly equivalent to another for the use to which it is put;.... When assessing reasonable interchangeability, '[f]actors to be considered include price, use, and qualities.' Reasonable interchangeability is also indicated by cross-elasticity of demand between the product itself and substitutes for it.'. As we explained in Tunis Brothers Co., Inc. v. Ford Motor Co., 952 F.2d 715, 722 (3d Cir.1991), 'products in a relevant market [are] characterized by a cross-elasticity of demand, in other words, the rise in the price of a good within a relevant product market would tend to create a greater demand for other like goods in that market.'
> Id., at 437-438 (internal citations omitted)

In an exclusive dealing situation, the "Rule of Reason"[4] requires "an inquiry into the actual effect of the exclusive contract on competition." Jefferson Parish Hosp Dist No. 2. v. Hyde, 466 U.S. 2, 104 S.Ct 1551, 80 L.Ed.2d 2 (1984), abrogated on other grounds by Illinois Tool Works, Inc. v. Independent Ink, Inc., 547 U.S. 28, 126 S.Ct. 1281, 164 L.Ed.2d 26 (2006). However, courts must not rely on a mechanistic approach to defining the market, "since the purpose of the inquiries into market definition...is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects' on competition obviates the need for a detailed analysis. F.T.C. v. Indiana Fed'n of Dentists, 476 U.S. 447, 460, 106 S. Ct. 2009, 2019, 90 L. Ed. 2d 445 (1986) (holding that evidence of "actual, sustained adverse effect on competition...is legally sufficient to support [an antitrust violation] even in the absence of elaborate market

---

[4] Certain types of behavior, such as horizontal price fixing and bid rigging, are "per se" anti-trust violations. See e.g. U.S. v. Socony Vacuum Oil Co., 310 U.S. 150, 60 S. Ct. 811, 84 L.Ed. 1129 (1942) and U.S. v. Fisbach & Moore, Inc., 750 F.2d. 1183 (3rd. Cir. 1984). All other anti-competitive behavior is governed by the "Rule of Reason", which is a general inquiry into whether "under all circumstances" the challenged conduct "imposes an unreasonable restraint on competition." Continental T.V., Inc. v. GTE Sylvania, 433 U.S. 36, 49, 97 S. Ct. 2549, 53 L. Ed. 2d 568 (1977).

analysis"); see also Eastman, 504 U.S. at 467, 112 S.Ct. at 2082 ("formalistic distinctions rather than actual market realities are generally disfavored in antitrust law.") "In other words, a plaintiff need not engage in a detailed market analysis "when the great likelihood of anticompetitive effects can easily be ascertained," see California Dental Ass'n v. F.T.C., 526 U.S. 756, 770, 119 S.Ct. 1604, 1613, 143 L.Ed.2d 935 (1999), as under certain circumstances the rule of reason can be applied "in the twinkling of an eye." Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma, 468 U.S. 85, 110, 104 S. Ct. 2948, 2965, 82 L. Ed. 2d 70 (1984) (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues, 37-38 (Federal Judicial Center, June 1981).

As the 7th Circuit stated succinctly in Toys "R" Us, Inc. v. F.T.C., 221 F.3d 928, 937 (7th Cir. 2000):

> [T]he share a firm has in a properly defined relevant market is only a way of estimating market power, which is the ultimate consideration. The Supreme Court has made it clear that there are two ways of proving market power. One is through direct evidence of anticompetitive effects. See FTC v. Indiana Fed'n of Dentists, 476 U.S. 447, 460-61, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) ('the finding of actual, sustained adverse effects on competition in those areas where IFD dentists predominated, viewed in light of the reality that markets for dental services tend to be relatively localized, is legally sufficient to support a finding that the challenged restraint was unreasonable even in the absence of elaborate market analysis.'). The other, more conventional way, is by proving relevant product and geographic markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case.

(b) Plaintiffs Have not Only Defined the Relevant Markets but also Demonstrated Actual Anticompetitive Effects

Plaintiffs' claim involving AMS's illegal exclusive dealing in Grip Tight and HPCS is part and parcel of its claim regarding the attempted monopolization of the municipal

roadway maintenance market in the Monopoly Area. See FAC, at ¶14. Moreover, Plaintiffs specifically delimited the geographic area covered by each exclusive dealing arrangement as the Northeast United States for Grip Tight (FAC, at ¶35) and the Monopoly Area for HPCS (FAC, at ¶48). Accordingly, a geographic market has been established with sufficient specificity.

Contrary to AMS's argument, Plaintiffs have also established the relevant product market. AMS's position that because Grip Tight and HPCS are interchangeable with other products, they cannot constitute their own market, is incorrect. AMS's position relies almost exclusively on Queen City Pizza, a case with no applicability to the facts at issue in this case.

In Queen City Pizza, Domino's franchisees sued Domino's alleging antitrust violations because Domino's forced its franchisees to purchase pizza ingredients from it at a much higher price than the franchisees could purchase the equivalent ingredients from third parties. The Third Circuit held that the franchisees' claims failed because the relevant product market included all equivalent pizza ingredients, not just the ingredients sold by Domino's. However, the Queen City Pizza Court's ***holding was explicitly based upon the terms of the plaintiffs' franchise contract*** with Domino's. As the Court explained, "plaintiffs here ***must*** purchase products from Domino's Pizza not because of Domino's market power over a unique product, ***but because they are bound by contract to do so***." 124 F.3d at 441 [emphasis supplied]. The Court went on to explain that if Domino's Pizza acted unreasonably with respect to the purchase of pizza making supplies, "plaintiffs remedy, if any, is in contract, not under antitrust law." Id. In fact, the Third Circuit

explained that if plaintiffs' reasoning in that case were adopted, every franchise agreement would violate antitrust laws, and for that reason no court had ever "defined a relevant product market with reference to the particular contractual restraints of the plaintiff." Id. at 438. Throughout its opinion, the Third Circuit contrasted the facts of the case to the facts in Eastman Kodak Company, supra, where the Court did find that a single brand of product can constitute a relevant product market. The facts here are squarely on point with Kodak.

In Kodak, third-party copy machine repair servicers sued Kodak for antitrust violations because Kodak refused to sell replacement parts to them, thus allowing it dominate the market for repair of Kodak copying machines. Kodak argued that a single brand of products could not constitute a relevant product market. The Court rejected that argument, finding that "the proper market definition can only be determined after a factual inquiry into the 'commercial realities' faced by consumers." 504 U.S. at 482, 112 S.Ct. at 2090. The Court found that because Kodak equipment was "not interchangeable with other manufacturers' service and parts" the relevant market could be limited to that brand. Id.

Regardless of the legality of the subject specifications, it is a fact that, like Kodak with Kodak parts, only AMS, with Grip Tight and HPCS, can supply the requisite product. By refusing to make the product available to third parties, AMS, like Kodak, not only has an arguably legitimate monopoly on product sales, but has unlawfully deprived consumers of the choice of who will perform the work using the product.

Accordingly, the FAC properly limits the relevant product markets to the Grip Tight and HPCS. While Plaintiffs do allege that equivalent materials exist, the "commercial

reality" faced by Plaintiffs, due to the subject bid specifications, is that Grip Tight and HPCS are not "interchangeable" with any other product. In fact, the bid specifications in question specifically prohibited substitution of equivalent materials. Thus, like the consumers who willingly bound themselves to use Kodak parts by buying Kodak equipment have their choice of who installs them, the Municipal Defendants have bound themselves to Grip Tight and HPCS, but ought to have a choice of who applies them.

Moreover, unlike Queen City Pizza, Plaintiffs are not a party to any contractual requirement limiting their choice of product. The reality is they have no choice, only Grip Tight and HPCS can used in the Monopoly Area, and AMS's exclusive dealing arrangement prohibits Plaintiffs from obtaining those products.

Finally, we point out that even though Plaintiffs have established the relevant markets, they need not have done so with precision because the FAC demonstrates the actual anticompetitive effects of AMS's actions. As the FAC explains, by way of its exclusive dealing arrangements, AMS effectively eliminated all competition for municipal roadway maintenance in the Monopoly Area. As the United States Supreme Court warned in Kodak and Indiana Federation of Dentists, supra, courts will not abide behavior that actually stifles competition because of the technicalities of an elaborate market analysis. Antitrust laws are designed to both promote competition and prevent the suppression and destruction of competition. Indiana Federation of Dentists, 476 U.S. at 458, 106 S.Ct at 2017. Here the FAC alleges that AMS has entered into exclusive dealing arrangements for Grip Tight and HPCS that directly and adversely destroyed competition, and although not required to do so, provided exhaustive detail about how competition was eliminated.

Accordingly, such allegations state a claim for relief under our antitrust law and the motion to dismiss must be denied.

## IV. The Noerr-Pennington Doctrine Does Not Apply To Bar Plaintiffs Antitrust, §1983, Tortious Interference Civil Conspiracy or State Law Claims.

As AMS correctly points out and with limited exception:

> "Where a restraint upon trade or monopolization is the result of ***valid governmental action***, those urging the governmental action enjoy absolute immunity for the anticompetitive restraint." [Emphasis Supplied]
> [AMS Br. P. 11]

The operative words at this juncture are "valid governmental action." Here, Plaintiffs have plead the bid specifications at issue are ***unlawful*** pursuant to 67 PA Code §449.3(f)[5] and thus *ultra vires*. (FAC ¶ 21-22)

At its broadest Noerr-Pennington protects unlawful conduct used to pass ***lawful legislation***. (See Justice Scalia's comments in dicta in City of Columbia v. Omni Outdoor Advertising, Inc., 499 U.S. 365, 383, 111 S.Ct. 1344, 1355, 113 L.Ed.2d 382 (1991) suggesting the Noerr doctrine goes so far as to protect unlawful lobbying efforts.) AMS focuses its Noerr argument on this point, discussing a series of post Columbia holdings stating that "conspiracies" to create anti-competitive legislation are protected by Noerr. [AMS Br.P. 12-13] We can not dispute the argument with any level of intellectual honesty.

---

[5] 67 PA Code §449.3(f) specifically makes the issuance of brand name specifications "unlawful" when Pennsylvania Liquid Fuels Tax monies are used to pay for road work. Here, it is alleged Liquid Fuels Tax Monies were used by each of the Defendant Municipalities.

However where the ***governmental action*** itself is unlawful, rather than the conduct that created it, Noerr-Pennington cannot apply.

Here, the Defendant Municipalities issued specifications which the Commonwealth had very specifically proscribed. Accordingly the issuance of the specifications was ***ultra vires***. See Albright v. City of Shamokin, 277 Pa. Super. 300 (Sup. Ct. Pa 1980) where the Court found that an Ordinance creating a retirement fund was within municipalities' jurisdiction to pass, but was ***ultra vires*** because it did not comply with substantive requirements of the enabling legislation. See also, Wilson v. Southeastern Pennsylvania Transp. Authority, 704 F. Supp 623, 624 (E.D. Pa. 1989) holding that SEPTA's agreement to pay a Deputy General Manager a salary of $110,000.00 without board approval was ***ultra vires*** because SEPTA deviated from the enabling legislation in awarding it.

Here, there is no doubt the Defendant Municipalities had the authority to issue bidding specifications, but when liquid fuels taxes were involved they had no authority to issue brand name/sole source specifications and, accordingly, their conduct was ***ultra vires***.

Going back to the Noerr case itself, our Supreme Court indicated its decision was not intended to protect illegitimate acts of government, stating:

> [I]t has been held that where a restraint upon trade or monopolization is the result of **valid governmental action**, as opposed to private action, no violation of the Act can be made out. These decisions rest upon the fact that under our form of government the question whether a law of that kind should pass, or if passed be enforced, is the responsibility of the appropriate legislative or executive branch of government so long as the law itself does not violate some provision of the Constitution. [Emphasis Supplied]

> Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136, 81 S.Ct. 523, 529, 5 L.Ed.2d 464 (1961)

The linkage between Noerr and "valid governmental action" has been repeated by our courts over and over through the years. See e.g. UIBO Corp., Inc. v. Conway, 669 F.3d 675, 684 (6th Cir. 2012); Xcalibur Intern. Ltd., LLC v. Gen. State of Louisiana, 612 F.3d 368, 379 (5th Cir. 2010) and this Circuit's Opinion in Armstrong Surgical Center, Inc. v. Armstrong County Memorial Hospital, 185 F. 3d 154, 159 (3d. Cir. 1999).

Here, the Defendant Municipalities issued "unlawful" specifications. Such invalid actions were never intended to be protected under Noerr, and AMS's efforts to expand that protection to same must be rejected.

## V. APS Has Standing To Challenge The Unlawful Bid Specifications

In Phillips Brothers Electrical Contractors, Inc. v. Valley Forge Sewer Authority, 999 A.2d. 652 (Pa Comm. Ct. 2010) the Pennsylvania Commonwealth Court allowed non-taxpayer standing by a disenfranchised potential bidder under similar circumstances.

In Phillips the Defendant Authority had put out a specification soliciting bids from prime contractors for upgrades to several pump stations. The Plaintiff was an electrical subcontractor who alleged that under the "Separation's Act", 53 P.S. §1003 et seq. the advertisement should have solicited bids from separate trades, including electrical. Because it did not, Plaintiff alleged it was precluded from submitting a bid. The trial court dismissed the action because the Plaintiff was neither a taxpayer nor ratepayer with regard to the Authority. The Commonwealth Court reversed, holding as follows:

As to the issue of standing, in order for a party to establish that it has standing, it must demonstrate that (1) it has a substantial interest in the subject matter of the litigation, (2) it has a direct interest in the litigation, and (3) the interest it is asserting is immediate and not a remote consequence of the action it seeks to challenge. Finn v. Rendell, 990 A.2d 100 (Pa.Cmwlth.2010).

In Mechanical Contractors Association of Eastern Pennsylvania, Inc. v. Southeastern Pennsylvania Transportation Authority, (Pa.Cmwlth.1995) (SEPTA), this Court considered a similar injunction action that an association filed against SEPTA, in which the association asserted that SEPTA had violated the Separations Act. The question presented in that case was whether SEPTA had complied with the Separations Act in requesting bids for a single design/build contract when it delegated to the prime contractor the duty to solicit bids from subcontractors. This Court, relying upon language from a decision of then-trial court Judge Ralph Cappy, Metz v. Housing Authority of the City of Pittsburgh [No. GD. 88-01957 (Allegheny C.C.P.), aff'd 121 P.A. Comwlth. 210 (1988), allocatur den. 525 Pa. 607 (1990)], concluded that SEPTA could not delegate that function to the prime contractor. We quoted Judge Cappy as follows:

The legislature clearly intended to keep the expenditure of public funds a process open and clear of any possible manipulations. To remove that process outside the hands of the appointed public officials charged with the duty of expending such funds, would be to infringe the rights of the public. It is clear to this Court that by implementing a procedure whereby the general contractor decides which subcontractor is to receive the work, denies the public their right to be assured that the work is awarded free of personal interest, bias, and prejudice. Furthermore, the Separation Act was intended to protect the materialmen who ... would become subject to the whim of a dishonest or incompetent general contractor; not only in the procedures the general contractor adopted for the award of work, but also for payment of work done. Regardless of whatever bond would be supplied by a general contractor under the proposed procedure, materialmen and subcontractors need the protection guaranteed by the involvement of responsible public officials. SEPTA, 654 A.2d at 121 The Court opined that the interest the Separations Act seeks to protect is the prevention of possible harms to

subcontractors and materialmen on individual contracts for public buildings. In addition to recognizing the interest in keeping the contract-award process open in order to protect the interests of taxpayers, the Court stated that it believed "that the legislative purpose [of the Separations Act] was ... to protect the plumbing, heating, ventilating and electrical contractors from the potential of dealing with unscrupulous general contractors." SEPTA, 654 A.2d at 122**.**

Phillips primarily asserts that the trial court took the wrong tack in approaching the petition for preliminary injunctive relief by analyzing the pleadings and evidence from the perspective of disappointed bidder law. Phillips suggests that this case is not a disappointed bidder case, arguing that the manner in which the Authority sought bids—that is, by seeking a single prime contractor instead of separate contractors as purportedly required by the Separations Act—essentially precluded Phillips from bidding on the contract.

Based upon this view, Phillips argues that it has standing because it works solely as a public contractor and (1) its business is based upon being a prime electrical contractor (rather than as a subcontractor to a prime) and any bid would be rejected as non-responsive on that ground ***[Any bid submitted by Plaintiffs here would be non-responsive as Plaintiffs cannot procure the requisite materials.]***, (2) if other public entities proceed as the Authority has done, Phillips would have no work ***[The Plaintiffs here would have no work if other municipalities proceed as the Defendant Municipalities here.]***, and (3) seeking to compel compliance with the Separations Act is the only feasible method of obtaining relief ***[Seeking to compel compliance with* 67 PA Code §449.3(f) is the only feasible way for Plaintiffs to obtain relief.]**. Phillips contends that the trial court's reliance upon this Court's decision in C.O. Falter Construction Corporation v. Towanda Municipal Authority, 149 Pa. Cmwlth 74 (1992) to conclude that Phillips lacks standing is misplaced. We agree, because C.O.Falter is a disappointed bidder case that did not arise under the Separations Act. Unlike the situation in disappointed bidder cases, in this case there is no reason to believe that a taxpayer would have an interest in seeking to promote this discrete statutory goal of protecting subcontractors ***[There is no reason to believe taxpayers would have an interest in promoting the discrete statutory goal of giving equal access to material suppliers.]***, and we agree with

> Phillips that the disappointed bidder standing requirements are not applicable in a case arising under the Separations Act. Rather, we conclude that the Separations Act itself provides Phillips with standing in this case. Phillips has a substantial interest in the contract the Authority seeks to award because the contract calls for the exact type of work that Phillips does in its business ***[The bids at issue here call for the exact type of work Plaintiffs perform.]***. This interest exceeds that of all citizens in procuring obedience to the law**.** Finn***,*** 990 A.2d at 103. Phillips has a direct interest in the litigation, because if the Authority had complied with the Separations Act, Phillips could be a successful bidder on the electrical work ***[If the Defendant Municipalities complied with the Pa Code, Plaintiffs could be successful bidders.]***. This factor supports the conclusion that there is a causal connection between the asserted violation of the Separations Act and the harm Phillips alleges. Id. Finally, Phillips' interest is immediate and not a remote consequence of the action it is seeking to challenge, because if it does not obtain relief it will lose an opportunity to bid on the electrical component of the project ***[If the Defendant Municipalities are not compelled to comply with the Pennsylvania Code, Plaintiffs will lose their opportunity to bid on roadway maintenance work.]***. The causal connection is neither remote nor speculative. Id. Phillips***,*** therefore, has established that it has standing under the Separations Act to challenge the Authority's attempt to circumvent the Separations Act.

In a nutshell, this is not a simple "disgruntled" bidder case. This is a case where every potential bidder in the Commonwealth, save one, AMS, is being precluded from bidding and/or supplying materials in direct contravention of Pennsylvania law. Just as in Phillips, the Plaintiffs here must be granted standing to enforce the Pennsylvania Code.

***CONCLUSION***

For the foregoing reasons it is respectfully submitted Asphalt Maintenance Solutions's motion should and must be denied.

HANKIN SANDMAN & PALLADINO
Counsellors at Law
A Professional Corporation

Dated: August 14, 2012

By: John F. Palladino
John F. Palladino, Esq.
Colin G. Bell, Esq.
john@hankinsandman.com
coling@hankinsandman.com
***Attorneys for Plaintiffs, Asphalt Paving Systems, Inc. and Dosch-King Co., Inc.***

U:\My Files\Asphalt Paving\Asphalt Maint - Hammaker\Pleadings\Mtn to Dismiss\Brief in Opposition.wpd