IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ASPHALT PAVING SYSTEMS, INC. and DOSCH-KING CO., INC., Plaintiffs, | : : : : | CIVIL ACTION NO. 12-2370 |
|---|---|---|
| v. | : : | |
| ASPHALT MAINTENANCE SOLUTIONS, LLC, Defendant. | : : : : : | FILED MAR 2 8 2013 MICHAEL E. KUNZ, Clerk By_____Dep. Clerk |

## MEMORANDUM OPINION AND ORDER

RUFE, J.                                                                                                         March 28, 2013

Plaintiffs Asphalt Paving Systems, Inc. ("APS") and Dosch-King Co., Inc. ("DKC") have filed a Complaint alleging violations of federal anti-trust and civil rights laws, and also asserting related state law claims. Defendant Asphalt Maintenance Solutions, LLC[1] has filed a Motion to Dismiss.

## I.    FACTS ALLEGED IN THE FIRST AMENDED COMPLAINT

Plaintiffs are New Jersey contractors engaged in the business of providing paving and roadway maintenance services to municipal government entities throughout Pennsylvania. Defendant is a Pennsylvania company which directly competes with Plaintiffs in the paving and roadway maintenance business in Lehigh County, Berks County, and Bucks County, Pennsylvania (the "three county area").

Under Pennsylvania law, municipal entities must solicit bids for any paving and roadway maintenance contract in excess of $18,500, and must award the contract to the lowest responsive and responsible bidder. Municipalities are prohibited from requiring use of specific products or

---

[1] Plaintiff has settled his claims against the municipality defendants. Therefore, the moving defendant is the sole remaining defendant in this lawsuit and will be referred to simply as "Defendant" throughout this Opinion.

brand names where equivalent products are available, and from showing favoritism or bias to any one bidder.[2]

Pursuant to an agreement with Hammaker East, Ltd., the maker of a fog seal (a road coating which can be sprayed over roads to provide a smooth, black appearance) called Grip Tight, Defendant is the sole distributor of Grip Tight in the Northeast United States. However, Defendant's competitors, including Plaintiffs, are able to obtain other fog seal products with equivalent properties and performance. When Plaintiff DKC attempted to purchase Grip Tight from Defendant, Defendant either inflated the price or refused to sell the product without an agreement to use Defendant as the application subcontractor.

Roadways in Pennsylvania are often paved through a process known as chip seal or bituminous seal coat ("BSC"). Bituminous material is applied, immediately followed by the application of a coarse aggregate. High performance chip seal ("HPCS") is a subcategory of chip seal which uses smaller stones (1/4 inch) rather than coarse aggregate, but is otherwise applied in the same manner and with the same equipment. While coarse aggregate is available to all contractors, there is only one source of the finer stone in the three county area – Silver Hill Quarry. In 2012, Defendant entered into an agreement to buy 6,000 tons of that stone from Silver Hill Quarry – the quarry's entire yield for the year. Plaintiffs have not found another source for the finer stone, even outside the three county area, and further alleges that the expense of trucking such stone from a distance would be prohibitive.

Chip seal, including HPCS, is applied using a spreader. Spreaders range in size from 16 feet to 24 feet. The size of the spreader can impact on the number of passes it takes to cover a road, depending on the width of the road in question. Defendant has a 22 foot spreader. Plaintiffs

---

[2] 67 Pa. Code § 449.3(f).

both have smaller spreaders but are in the process of purchasing or converting to a 22 foot spreader.

Several municipalities issued advertisements soliciting bids for the maintenance of roads which required 1/4 inch stone after Defendant entered into the 2012 agreement to purchase Silver Hill Quarry's fine stone yield for the year.

One such municipal call for bids was for the North Whitehall Township project, which required HPCS with 1/4 inch or 3/8 inch stones and Grip Tight fog seal, and noted "NO Alternative products will be considered."[3] The township further required that the successful contractor "have a minimum of three (3) years experience in applying this specialized type of chip seal and fog seal"[4] and have worked with a minimum of three municipalities to apply Grip Tight and HPCS over the course of those three years. The contract could be extended for up to three years upon mutual agreement. No facts are alleged with regard to whether or to whom the contract was awarded.

Plumstead Township's bid specifications similarly required HPCS with 1/4 or 3/8 inch stones and Grip Tight fog seal, and stated that no alternative products would be considered. It also required bidders to "provide a minimum of 3 municipalities with contact person, phone number, and locations where you applied a *High Performance Chip Seal* and *Grip Tight* Fog Seal within the past three (3) years in Pennsylvania, projects must be equal to or greater than this project."[5] Additionally, Plumstead Township also required use of a spreader which was at least

---

[3] Compl. ¶ 66; see also ¶¶ 67, 68.

[4] It is unclear from the Complaint whether Plaintiffs were able to obtain Grip Tight and 1/4 inch stones in the three years prior to 2012.

[5] Compl. ¶ 79.

3

22 feet wide. This contract could also be extended for up to three years. No facts are alleged with regard to whether or to whom the contract was awarded.

Upper Macungie Township's request for bids was substantially similar to that of Plumstead Township, but additionally asked bidders to list a minimum of fifteen seal coat projects completed in Pennsylvania in 2011. Plaintiffs note that Defendant was the only contractor typically competing in the three county area that completed fifteen or more projects in Pennsylvania in 2011, although Plaintiffs had completed an equivalent amount of work outside of Pennsylvania. Plaintiff DKC protested the specifications in Upper Macungie Township's request for bids. Upper Macungie Township did not amend the specifications, but it also did not award the project.

Solebury Township's advertisement for bids for a crack sealing project also required use of HPCS with 1/4 inch stone and Grip Tight fog seal, but did not contain language indicating that the Township would not consider alternative products. The Solebury specifications also required use of a 22 foot spreader. Plaintiff APS chose not to bid on the project, because it had no source of Grip Tight or 1/4 inch stone. Plaintiff DKC submitted a proposal using a substitute material for Grip Tight and without a source for 1/4 inch stone or a 22 foot spreader. Defendant submitted a lower bid and was awarded the project.

Brecknock Township's advertisement for bids for a crack sealing project also required use of HPCS with 1/4 inch stone and Grip Tight fog seal, required experience completing three jobs using those materials over the previous three years, and specified that no alternative products would be considered. The statement of bidder qualifications asked bidders to list fifteen BSC projects completed in Pennsylvania in 2011. APS wrote a letter to the Township complaining of the preclusive effect of the specifications. Brecknock Township revised the specifications and

4

allowed open bidding. An employee of the Brecknock Township Roads Department told the vice president of DKC, Peter King, that the original specifications had been given to them by Defendant.

Plaintiff also discusses "rollover contracts," initially entered into in 2011. Plaintiff APS did not submit bids for any of these contracts, because it did not wish to perform fog seal or BSC work in the three county area in 2011.

In March 2011, Upper Macungie Township solicited bids for a project that involved application of BSC (not HPSC) and Grip Tight on various roads. The request for bids referred to fog seal by the brand name Grip Tight, but it did not contain language indicating that no alternative products would be considered. Plaintiff DKC submitted a bid on the project, believing it would be able to purchase Grip Tight from the manufacturer. Defendant was awarded the project, which may be renewed annually for up to three years.

Olney Township solicited bids in May 2011. The request for bids indicated that the contractor would be required to use HPCS and Grip Tight, and that no alternative products would be considered. Olney Township also required use of a 22 foot spreader. Plaintiff DKC did not submit a bid because it could not submit a conforming bid. Defendant was awarded the contract, which may be renewed annually for up to three years.

Finally, the Borough of Macungie advertised for bids in May 2011. The schedule of prices listed 1/4 and 3/8 inch stone should be used in the BSC, and that Grip Tight should be applied, but the request for bids did not state that no alternative products would be considered. Plaintiff DKC did not submit a bid because it could not provide Grip Tight. This contract was also awarded to Defendant, and it may be renewed annually for up to three years.

## II. STANDARD OF REVIEW

Dismissal of a complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate where a plaintiff's "plain statement" does not possess enough substance to show that plaintiff is entitled to relief.[6] In determining whether a motion to dismiss is appropriate the court must consider those facts alleged in the complaint, accepting the allegations as true and drawing all logical inferences in favor of the non-moving party.[7] Courts are not bound to accept as true legal conclusions couched as factual allegations.[8] Something more than a mere *possibility* of a claim must be alleged; the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face."[9] The Complaint must set forth direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory.[10] The court has no duty to "conjure up unpleaded facts that might turn a frivolous action. . . into a substantial one."[11]

## III. DISCUSSION

### A. Antitrust Violations

Plaintiffs argue that they are direct competitors of Defendant in the relevant market, that Defendant has engaged in an anti-competitive scheme in restraint of trade, that Defendant has monopolized or attempted to monopolize the municipal roadway maintenance market in the three

---

[6] Bell Atl. Corp. v. Twombly, 550 U.S. 544, 557 (2007).

[7] ALA, Inc. v. CCAIR, Inc., 29 F.3d 855, 859 (3d Cir. 1994); Fay v. Muhlenberg Coll., No. 07-4516, 2008 WL 205227, at *2 (E.D. Pa. Jan. 24, 2008).

[8] Twombly, 550 U.S. at 555, 564.

[9] Id. at 570.

[10] Id. at 562.

[11] Id. at 562 (citing McGregor v. Indus. Excess Landfill, Inc., 856 F.2d. 39, 42-43 (6th Cir. 1988)).

county area, and that Defendant's actions have injured Plaintiffs.[12]

### 1. Sherman Act, Section 1 Claims

Section 1 of the Sherman act prohibits contract, conspiracies, and combinations in restraint of trade.[13] A claim under Section 1 must allege collective action— i.e. an agreement between two or more actors.[14] A plaintiff must also plead: 1) concerted action by the parties to the agreement, acting with unity of purpose or common design to engage in unlawful behavior; 2) causing anti-competitive effects within the relevant product and geographic markets; and 3) causing injury to the plaintiff.[15]

Plaintiffs allege that Defendant entered into two different sets of agreements in restraint of trade. First, they assert that Defendant entered into an exclusive dealer agreement with the manufacturer of Grip Tight, Hammaker East, and an agreement to buy the total annual output of 1/4 inch stone from Silver Hill Quarry. Plaintiffs additionally allege that Defendant colluded with the former-defendant municipalities to require the use of Grip Tight and 1/4 inch stone and other criteria designed to limit bidders on municipal roadwork contracts.

    *a.*    *Agreements with Suppliers*

An agreement may constitute an illegal restraint of trade under 15 U.S.C. § 1 when an

---

[12] To state a claim for antitrust violations, Plaintiffs must define a relevant product market and geographic market, and explain the Defendant's power within that market. Here, the Court notes that Plaintiffs have put forth sufficient facts to support their proposed product market definition (i.e. paving and roadway maintenance services, for which the service contractor also provides the paving materials), but has not pled sufficient facts in support of the proposed geographic market (while it is alleged that Plaintiffs and Defendant were rivals in the three county area in 2012, it may not be appropriate to limit the geographic market to the three county area, given Plaintiffs' allegation that they compete for contracts throughout Pennsylvania, whereas Defendant does not.), nor have they pled sufficient facts regarding Defendant's market power.

[13] 15 U.S.C. § 1.

[14] Mathews v. Lancaster Gen. Hosp., 87 F.3d 624, 639 (3d Cir. 1996).

[15] Id.

unreasonable restraint of trade is either an object or effect of the agreement.[16] Plaintiffs allege no facts from which the Court can find that the suppliers of Grip Tight and 1/4 inch stone entered into the agreement with the object of restraining trade. Additionally, Plaintiffs admit to the availability of equivalent products on the market to which Plaintiffs and other competitors have access. Because of the availability of equivalent materials, without the bid specifications put forth by the municipalities, Defendant's agreements with Hammaker East and Silver Hill Quarry would not have the effect of restraining trade. Accordingly, the Court finds, as a matter of law, that Defendant's agreements leading to market control over Grip Tight and 1/4 inch stone for HPSC, without the specifications of the municipalities, did not have the object and would not have the effect of restraining trade within or barring entry into the relevant product market. Therefore, Defendant's agreements with the suppliers cannot violate the Sherman Act.

  b. *Agreements with Municipalities and the Noerr-Pennington Doctrine*

To the extent that Plaintiffs allege that Defendant violated the Sherman Act in its dealings with the municipalities, those claims are subject to the *Noerr-Pennington* Doctrine. The *Noerr-Pennington Doctrine* holds that "where a restraint upon trade or monopolization is the result of [otherwise] valid governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out."[17] In other words, it "shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose."[18] "The dual principles underlying the *Noerr-Pennington* Doctrine are the constitutional right to petition under the First Amendment and

---

[16] Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 614 (1953).

[17] Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 136 (1961).

[18] United Mine Workers of Am. v. Pennington, 381 U.S. 657, 670 (1965).

the importance of open communication in representative democracies."[19] The Supreme Court has noted that the *Noerr-Pennington* Doctrine rests on two grounds:

> 1) In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.
>
> (2) The right of petition is one of the freedoms protected by the Bill of Rights, and we cannot, of course, lightly impute to Congress an intent to invade these freedoms.[20]

Because of these important constitutional concerns, the *Noerr-Pennington* Doctrine "immunizes private parties against antitrust liability based on the petitioning of government entities, even if there is an improperly anti-competitive motive or purpose behind the petition."[21] The Third Circuit instructs that if a defendant's conduct "constitutes valid[22] petitioning, the petitioner is immune from antitrust liability"[23] even if the petitioner is seeking anticompetitive action from the

---

[19] Mariana v. Fisher, 338 F.3d 189, 197 (3d Cir. 2003).

[20] Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (internal quotation marks and citations omitted).

[21] Byers v. Intuit, Inc., 600 F.3d 286, 298 (3d Cir. 2010).

[22] Third Circuit jurisprudence shifts the term "valid" from modifying government action to modifying the petitioning activity, and recognizes an exception to the *Noerr-Pennington* Doctrine for "sham" (as opposed to "valid") petitioning, "i.e. where [petitioning] is not genuinely aimed at procuring favorable government action." See, e.g., Armstrong Surgical Ctr., Inc. v. Armstrong Cnty. Mem'l Hosp., 185 F.3d 154, 158 (3d Cir. 1999) (internal quotation marks omitted).

[23] Byers, 600 F.3d at 298.

government.[24] The Third Circuit does not recognize a commercial exception to the *Noerr-Pennington* Doctrine.[25]

Here, Defendant exercised its right to petition the government for favorable treatment. Therefore, Defendant argues, it is immune from Plaintiffs' claims under the *Noerr-Pennington* Doctrine. Specifically, it argues that even if it urged the municipalities to adopt the specifications at issue, the market advantage it allegedly enjoyed was the result of government action, not private action;[26] therefore, Defendant asserts it is entitled to absolute immunity from antitrust liability for those actions.

Plaintiffs admit that municipal action led to the alleged injury, but argue that Defendant's conduct is not immunized because the municipalities did not, here, engage in "valid" government action, as the specification of name brand products, such as Grip Tight fog seal, and the refusal to accept bids proposing use of alternative products which are equivalent in performance violate state prohibitions on issuing requests for bids which have an anti-competitive impact. However, Plaintiffs cite to no cases in which a court denied Noerr-Pennington immunity because the government action was invalid. As noted above, the Third Circuit jurisprudence focuses on whether the *petitioning* activity is valid or a sham, and reinforces the constitutional rationale underlying the *Noerr-Pennington* Doctrine. Plaintiffs do not allege invalid petitioning activity

---

[24] Mariana, 338 F.3d at 198.

[25] Santana Prod., Inc. v. Bobrick Washroom Equip., Inc., 401 F.3d 123, 141 (3d Cir. 2005); Bristol-Meyers Squibb Co. v. IVAX Corp., 77 F. Supp. 2d 606, 614-15 (D.N.J. 2000) ("Antitrust immunity is not destroyed by a commercial relationship between the government and a private actor.")

[26] For example, Plaintiffs do not allege that they were injured by the *process* of lobbying, but rather by the *product* of the lobbying— i.e. the municipalities' adoption of specifications for bids which favored Defendant. Thus, the claims do not fall within the "sham" exception to the Doctrine. See Noerr, 365 U.S. at 142; City of Columbia v. Omni Outdoor Adver., Inc., 499 U.S. 365, 380 (1991).

here. Furthermore, the "invalid" government action alleged in this case is directly tied to the anti-competitive impact at issue, and Plaintiffs do not allege that the bid process was *otherwise* invalid. Because the Third Circuit has not recognized an "invalid government action" exception to the *Noerr-Pennington* Doctrine, and the Court finds no basis for recognizing such an exception in this case, Defendant is immune from liability under the *Noerr-Pennington* Doctrine.

Plaintiffs also allege that Defendant misled the municipalities by falsely asserting that the Pennsylvania Department of Transportation (PennDot) approves the use of Grip Tight when, in fact, PennDot prohibits the use of all fog seal products, including Grip Tight. This does not change the result. The Supreme Court in Noerr and the Third Circuit in Armstrong Surgical Center have held that even where the private party deliberately deceives public officials, the private party is immune from suit under the *Noerr-Pennington* Doctrine where, as here, the government is not wholly dependent upon the antitrust defendant for the factual information on which the decision is based.[27] Here, the municipalities were not dependent upon potential vendors for information about PennDot regulations. Accordingly, as the Court does not find that an exception to the *Noerr-Pennington* Doctrine exists in this case, Defendant is immune from liability for urging the municipalities to write bid specifications which would favor Defendant.

Even if the *Noerr-Pennington* Doctrine did not immunize Defendant's conduct, the facts set forth in the Complaint are not sufficient to state an anti-trust claim. Merely alleging that Defendant successfully urged the municipalities to adopt specifications favorable to it prior to the

---

[27] See Armstrong Surgical Ctr., Inc., 185 F.3d at 162.

issuance of the requests for bids is not sufficient to state a claim for anti-trust violations.[28] Plaintiffs do not allege that Defendant barred Defendant's competitors from meaningful access to petition municipal officials on their own behalf prior to the issuance of the requests for bids, nor do they allege that Defendant usurped the municipal decision-making process.[29] Therefore, the decision regarding specifications was ultimately in the hands of the consumer municipalities, who were free to reject the specifications urged by Defendant. Moreover, Plaintiffs allege that at least one municipality changed its bid criteria *after* they were issued, in response to feedback from Defendant's competitors. As Defendant had the right to petition the government for favorable contract specifications, where its actions did not prevent competitors from doing the same, its success does not render Defendant liable for antitrust violations.[30]

### 2. Sherman Act Section 2 Claims

Section 2 of the Sherman Act prohibits people or entities from monopolizing or attempting to monopolize trade.[31] Unlike Section 1, a party can violate Section 2 through unilateral conduct which creates or attempts to create or further a monopoly. To state a claim under Section 2, a plaintiff must demonstrate "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving

---

[28] The Third Circuit has found that such efforts do not violate anti-trust laws. Santana Prods., 401 F.3d at 133 (citing Stearns Airport Equip. Co., Inc. v. FMC Corp., 170 F.3d 518, 522 (5th Cir. 1999)).

[29] Id. (finding no anti-competitive conduct where defendants urged government architects to specify their materials rather than the materials supplied by competitors but competitors were free to tout the superiority of their own materials, characterizing such action as salesmanship or "classic competition on the merits of a product").

[30] Armstrong Surgical Ctr., 185 F.3d at 161.

[31] 15 U.S.C. § 2.

monopoly power."[32]

Determining whether a dangerous probability of achieving monopoly power exists requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market."[33] Because Plaintiffs have not pled and the facts alleged do not support an inference that Defendant can obtain a significant market share of the municipal road work in Pennsylvania through unilateral action,[34] and because Defendant is immunized under the *Noerr-Pennington* Doctrine where any anti-competitive effects are the result of government action (i.e. issuing bid specification favorable to Defendant), the Court finds Plaintiffs have not adequately pled a Section 2 claim.[35]

3.  Clayton Act Claims

Plaintiffs also argue that Defendant violated the Clayton Act's prohibition against exclusive dealing contracts, in which a seller agrees to a sale on condition that the buyer stop dealing with the seller's competitors, and the effect substantially lessens competition or tends to create a monopoly in a line of commerce.[36] Plaintiffs claim that Defendant improperly restrained trades by entering into an exclusive distributorship agreement for Grip Tight and by purchasing all locally available 1/4 inch stone. However, Plaintiffs acknowledge that equivalent products were available to competitors. Had the municipalities not specified the use of Grip Tight and 1/4 inch

---

[32] Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994) (internal quotation marks omitted).

[33] Id. (internal quotation marks omitted).

[34] Because Plaintiffs have access to functionally equivalent materials to those Defendant has monopolized, Plaintiffs can compete with Defendant for municipal contracts so long as the municipalities do not require the use of specific brands or categories of materials.

[35] Id. at 513 (attempted monopoly does not occur in the absence of a significant market share).

[36] 15 U.S.C. § 14.

13

stone and indicated that use of equivalent products would not be permitted, then Defendant's actions could not have affected the market. In other words, it was not the exclusive dealing contracts that limited Plaintiffs' ability to compete in the three county area, but Defendant's control over Grip Tight and 1/4 inch stone supplies *in conjunction with* municipal specifications requiring use of those supplies. Because Defendant is immune from liability for anti-competitive effects resulting from municipal action, and there is no anti-competitive impact in the absence of the restrictive municipal specifications, the *Noerr-Pennington* Doctrine provides immunity to Defendant for Plaintiffs' claims under the Clayton Act claims as well.[37]

### B. Section 1983 Claims

Plaintiffs allege that Defendant and the municipalities conspired to violate their civil rights, discriminating against Plaintiffs and denying them an equal and fair opportunity to win roadway maintenance contracts without any rational basis for doing so, in violation of 42 U.S.C. Section 1983. Plaintiffs attempt to assert Section 1983 claims against Defendant by asserting that Defendant "arrogat[ed] itself to the power" of the municipal defendants, and therefore was acting under color of state law and as a state actor. However, Plaintiffs assert no facts from which the Court can infer that Defendant arrogated state power or was otherwise acting under color of state law, as opposed to merely attempting to influence actual state actors. Furthermore, the Third Circuit instructs the Court that restrictions on liability recognized by the *Noerr-Pennington* Doctrine apply with equal force to liability under the Civil Rights Act.[38] Accordingly, the Section

---

[37] Calif. Motor Trans. Co., 404 U.S. at 511.

[38] Herr v. Pequea Twp., 274 F.3d 109, 117 (3d Cir. 2001), abrogated on other grounds by United Artists Theatre Circuit v. Twp. of Warrington, 316 F.2d 392 (3d Cir. 2003).

1983 against Defendant will be dismissed.

## C. State Law Claims

Plaintiffs also assert state law claims against Defendant for interference with prospective contractual and economic opportunity, and for civil conspiracy. Specifically, Plaintiffs allege that Defendant "induced" the municipalities and/or formed an agreement with the municipalities to unlawfully prevent Plaintiffs from attaining roadway maintenance contracts in the three county area. Neither of these claims is viable, as Defendant is also immune from tort liability under the *Noerr-Pennington* Doctrine.[39]

The Court notes that Plaintiffs also seek injunctive relief prohibiting Defendant from "engaging in further unlawful conduct in violation of Pennsylvania municipal bidding laws." For the constitutional reasons set forth above, the Court cannot enjoin or otherwise restrict Defendant from petitioning the municipalities for favorable specifications.[40] As Plaintiffs have settled with the municipal defendants, Plaintiffs' claim for injunctive relief will be dismissed.

## IV. CONCLUSION

For the reasons set forth above, Defendant's motion to dismiss is granted and Plaintiffs' claims against Asphalt Maintenance Solutions, LLC are dismissed with prejudice. An appropriate order follows.

---

[39] Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 159-60 (3d Cir. 1988) (holding that the "rule that liability cannot be imposed for damage caused by inducing legislative, administrative or judicial action is applicable" to tort claims when a defendant exercised its First Amendment right to attempt to influence government action and government action caused the injury to plaintiff); see also Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119, 128 (3d Cir. 1999).

[40] Plaintiffs have not alleged facts from which the Court can infer that Defendant engaged in unlawful conduct, as opposed to lawful petitioning of government officials for favorable action.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPHALT PAVING SYSTEMS, INC. and DOSCH-KING CO., INC., Plaintiffs, | : : : : CIVIL ACTION NO. 12-2370 |
| v. | : : |
| ASPHALT MAINTENANCE SOLUTIONS, LLC, Defendant. | : : : : |

# ORDER

AND NOW, this 28th day of March 2013, upon review of Defendant's Motion to Dismiss the First Amended Complaint [Doc. No. 42], Plaintiffs' response, Defendant's reply, and Plaintiffs' sur-reply, and for the reasons set forth in the Memorandum Opinion entered this date, it is hereby **ORDERED** that the Motion is **GRANTED**. Plaintiffs' First Amended Complaint is **DISMISSED** with prejudice. As Plaintiffs' claims against the municipal defendants have been settled, the Clerk of Court is **DIRECTED** to mark this case **CLOSED**.

It is so **ORDERED**.

BY THE COURT:

/s/ Cynthia M. Rufe
Cynthia M. Rufe, J.